GEOPHYSICAL SERVICE, INC.,
Libellant,

v.

The F/V TEMPEST, her engines, tackle, furniture, apparel, etc., et al.,
Respondents.

No. 65–C–24.

United States District Court
S. D. Texas,
Corpus Christi Division.

Nov. 15, 1967.

James E. Ross, Blades, Crain, Slator, Winters & Ross, Houston, Tex., for libellant.

R. W. Woolsey, Kleberg, Mobley, Lockett & Weil, Corpus Christi, Tex., for respondent F/V Tempest.

William L. Ellis, Ellis & Andrews, Aransas Pass, Tex., for respondent F/V Chrissy & Kathy.

## MEMORANDUM AND ORDER:

SEALS, District Judge.

This case within the Admiralty and Maritime jurisdiction of this Court involves a collision at sea between a geo-physical streamer cable owned by the libellant and the two fishing vessels, the CHRISSY & KATHY and the TEMPEST. No contact was made between the hulls of any of the vessels.

The libellant, Geophysical Service, Inc., (hereinafter known as G.S.I.) is a corporation authorized to do business under and by virtue of the laws of the State of Texas.

Both the F/V CHRISSY & KATHY and F/V TEMPEST are wood hulled, diesel powered shrimp trawlers. The CHRISSY & KATHY is owned by Duque & Duarte, Inc., a Texas corporation, and the F/V TEMPEST is owned by Wilson Gooding, an individual. Duque & Duarte, Inc. and Wilson Gooding appear as claimants of their respective vessels.

In the early morning of November 25, 1965, the M/V PACIFIC SEAL and the M/V CAMPECHE SEAL, both owned by Seal Fleet, Inc., and under charter to G.S.I., were engaged in seismographic operations in the Gulf of Mexico about thirty (30) miles off the coast of Port O'Connor, Texas, in international waters. The sea was calm and visibility was good. The Seal Fleet vessels were operated by T. J. Falgout, Jr. Boat Company in accordance with a services contract between Falgout and G.S.I. Neither Seal Fleet nor Falgout are parties to this action.

The M/V PACIFIC SEAL, the "recording vessel" was towin ga seismic recording cable approximately 7800 feet in length. Tied to the end of the seismic cable were two bright orange buoys 22.9 inches in diameter. These buoys were approximately 1000 feet from the end of the last section of the seismic cable. From the stern of the M/V PACIFIC SEAL to the buoys there was a distance of about 8800 feet. At the rear of the G.S.I. flotilla was the M/V CAMPECHE SEAL, the "shooting vessel", which maintained a distance of 150 to 200 feet from the buoys. Another member of the G.S.I. flotilla, the M/V CARL

M II, a smaller vessel used as a supply boat, was also in the area.

The seismic cable was made up of numerous sections about 100 feet in length. There were at least 24 "live" sections and about 54 "dead" sections. As a general rule the live and dead sections are alternately placed.

A section of the cable has an outside plastic coating, and a live section can readily be distinguished because of the various electronic materials within it such as hydrophones which record the sound waves emanating from the blasting operations. Strain and signal wires run the entire length of the cable. When in operation the cable is filled with a kerosene-type fluid known as noroma.

Libellant G.S.I., the owner of the cable, contends that the towing vessel, M/V PACIFIC SEAL, is absolved from any fault because it was conforming to 33 U.S.C. § 1064(c) [1] in that it was showing proper signals, maintaining course and speed, and engaged in activities within the meaning of the section. G.S.I. asserts that the entanglement with the cable and the fishing nets of the F/V CHRISSY & KATHY and the F/V TEMPEST was because of the fault of the operators of both vessels; that the vessels were warned to steer away from the cable, but in spite of the warnings they continued on until their nets and the cable were entangled. Further, G.S.I. contends that the respondent vessels raised the cable to their decks, did serious and extensive damage to the cable intentionally, and took portions of the cable to the port of Aransas Pass, Texas, where they were held for ransom.

In addition to the many particulars in which G.S.I. alleges the fishing vessels were at fault, it also contends that Alipio Duque in his individual capacity is liable to the libellant for a greater portion, if not all, of the libellant's damages because he issued instructions to the captain of the F/V CHRISSY & KATHY with respect to the treatment which should be given the libellant's cable after the collision, and that he personally refused libellant's lawful demand for delivery and possession of its property.

G.S.I. asks damages in the amount of at least $65,000.00 because of the cost to repair the cable and the delay in its operations which resulted in loss of earnings under its contract with Pan American Petroleum Corporation.

The fishing vessels and their claimants deny the allegations of G.S.I. and contend that they had a right of way into collision under the Starboard Hand Rule (33 U.S.C. § 1081).[2] They also deny having refused G.S.I.'s lawful de-

1. § 1064. Vessels and seaplanes not under command, and vessels engaged in certain operations (Rule 4).

(c) A vessel engaged in laying or in picking up a submarine cable or navigation mark, or a vessel engaged in surveying or underwater operations, or a vessel engaged in replenishment at sea, or in the launching or recovery of aircraft when from the nature of her work she is unable to get out of the way of approaching vessels, shall carry, in lieu of the lights prescribed in section 1062(a) (i) and (ii) or section 1067(a) (i) of this title, three lights in a vertical line one over the other so that the upper and lower lights shall be the same distance from, and not less than 6 feet above or below, the middle light. The highest and lowest of these lights shall be red, and the middle light shall be white, and they shall be of such a character as to be visible all round the horizon at a distance of at least 2 miles. By day, she shall carry in a vertical line one over the other not less than 6 feet apart, where they can best be seen, three shapes each not less than 2 feet in diameter, of which the highest and lowest shall be globular in shape and red in colour, and the middle one diamond in shape and white.

2. § 1081. Power-driven vessels crossing (Rule 19).

When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other. Pub.L. 88–131, § 4, Sept. 24, 1963, 77 Stat. 206.

mand for return of its property and both claim that they performed a salvage service to the cable.

■ Alipio Duque contends that he did nothing to incur individual liability, with which the Court agrees.

At the time of the collision, about a half hour after sunrise, the G.S.I. flotilla was moving in a westerly direction at six (6) nautical miles per hour with the seismic cable being towed at a depth of approximately 35 feet. The lead vessel, the M/V PACIFIC SEAL, first noticed the trawling F/V CHRISSY & KATHY a half mile off the starboard bow as it appeared to be crossing course with the path of the flotilla. Shooting operations had been going on for nearly thirty (30) minutes. Off to the left of the F/V CHRISSY & KATHY at a distance of two (2) miles from the lead vessel was the F/V TEMPEST. The M/V PACIFIC SEAL had already passed the bow of the F/V TEMPEST, which was maintaining a steady course and a speed of three (3) nautical miles per hour.

When the crew of the M/V PACIFIC SEAL realized that the F/V CHRISSY & KATHY was not turning away but was on a collision course with the cable, the ship's whistle was repeatedly blown, and crew members stood atop the wheelhouse trying to wave the fishing vessel away. The F/V CHRISSY & KATHY, ignoring the warnings, continued ahead on its collision course and subsequently became entangled with the cable 2500 feet astern of the M/V PACIFIC SEAL. Then the M/V PACIFIC SEAL stopped dead in the water and began operations to try to pull in the cable. The F/V CHRISSY & KATHY also began to pull in her equipment and when her fishing nets and doors were raised the cable was entangled in them. The crews of both vessels then engaged in a verbal fracas as various measures were taken to try and untangle the cable. Thereafter the F/V TEMPEST became entangled with the cable some 700 feet from the end of the seismic cable proper and about 1700

feet from the tail buoys. The F/V TEMPEST also raised its nets and began operations to free itself from the cable. The seismic cable was so entangled in the rigs of the fishing vessels that neither the crews of the trawlers nor the crews of the Seal Fleet vessels were able to disengage them while at sea. G.S.I. later recovered 1900 feet of the cable from the fishing vessels and sent it to Berwick, Louisiana for repairs; the actual, fair and reasonable cost of such being $5,927.09. As to the cable that was lost, there is no evidence to support a finding of the amount or value of such cable.

■ There was a myriad of accusations and counteraccusations in this case concerning what happened with respect to the cable after the collisions and entanglements. The crew of the F/V CHRISSY & KATHY did proceed to cut the cable in one or more places and further contributed to its damage. There was, however, no evidence of any cutting on the part of the F/V TEMPEST. The damages to the cable at the time of the entanglements and thereafter were a proximate result of the collision of the fishing nets of the F/V CHRISSY & KATHY and the seismic cable.

■ Had the flotilla not stopped as a result of the collision and entanglement of the cable and the F/V CHRISSY & KATHY, the F/V TEMPEST, maintaining a steady course and speed of three (3) nautical miles per hour, would not have collided with the drifting cable. (The F/V TEMPEST intercepted the cable 700 feet from the end and 1700 feet from the terminal buoys.) In their relative positions, the F/V TEMPEST was at least one mile from the cable when the F/V CHRISSY & KATHY collided with it. Had the flotilla maintained its course and speed of six (6) nautical miles per hour the end of the cable and buoys would have traveled their respective 700 and 1700 feet and passed the point of impact with the F/V TEMPEST. The F/V TEMPEST, at

three (3) nautical miles per hour, could not have traveled the distance of over 5000 feet in time to collide with the cable at any point. After the forward movement of the cable was stopped because of the entanglement with the F/V CHRISSY & KATHY, the cable began to drift. There was no evidence that the M/V CAMPECHE SEAL, at the end of the flotilla and in proximity to the F/V TEMPEST, was displaying any signals as was the lead vessel M/V PACIFIC SEAL. The evidence was not clear as to when or what type of warning was given by the M/V CAMPACHE SEAL to the F/V TEMPEST. It is evident that there was general confusion in the terminal area of the cable and it would have been difficult for any vessel under the circumstances to have known just where the cable was. Thus the actions of the F/V TEMPEST were not a substantial factor in producing the events that occurred. See Prosser, The Law of Torts § 41 (3rd ed.1964).

 The M/V PACIFIC SEAL was operating under and in conformance with 33 U.S.C. § 1064(c), supra, n. 1, in that it was engaged in underwater operations as contemplated by the section. The fishing vessel privilege of 33 U.S.C. § 1088 [3] exempts vessels to which the provisions of Section 1064 apply, which would exempt the M/V PACIFIC SEAL under the circumstances of this case. A strict application of the Starboard Hand Rule, 33 U.S.C. § 1081, supra, n. 2 would not apply in this situation because vessels engaged in fishing are privileged over all vessels and have the right of

way with the exception, as expressly provided, of vessels operating under section 1064. The intent of the drafters of the new Regulations for Preventing Collisions at Sea, 33 U.S.C. §§ 1051–1094, effective September 1, 1965, is further clear when viewed in light of 33 U.S.C. § 1064(f):

> "The lights and shapes prescribed in this section are to be taken by other vessels and seaplanes as signals that the vessel or seaplane showing them is not under command and cannot therefore get out of the way."

No special circumstances existed under the General Prudence Rule of 33 U.S.C. § 1089 [4] to work a departure from any other rules in order to absolve the F/V CHRISSY & KATHY from fault. It is evident that the master of the F/V CHRISSY & KATHY was familiar with the seismographic operations of the flotilla, knew that a cable was being towed behind and had heard the explosives set off by the operations. He testified, however, that he was aware of the M/V PACIFIC SEAL only two minutes prior to colliding with the cable. Further he testified that he did not know the meaning of the signals displayed on the M/V PACIFIC SEAL.

 The F/V CHRISSY & KATHY was negligent (1) in failing to keep a proper lookout; (2) in failing to timely turn away from the flotilla; (3) in failing to recognize the signals displayed by the M/V PACIFIC SEAL. In addition she was unseaworthy and negligent in that she failed to have a copy of the Rules of the Road on board. All of

---

**3.** § 1088. Right of way of fishing vessels; obstruction of fairways (Rule 26).

All vessels not engaged in fishing, except vessels to which the provisions of section 1064 of this title apply, shall, when under way, keep out of the way of vessels engaged in fishing. This section shall not give to any vessel engaged in fishing the right of obstructing a fairway used by vessels other than fishing vessels. Pub.L. 88–131, § 4, Sept. 24, 1963, 77 Stat. 207.

**4.** § 1089. Special circumstances requiring departure from rules to avoid immediate danger (Rule 27).

In obeying and construing sections 1078–1089 of this title due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from such sections necessary in order to avoid immediate danger. Pub. L. 88–131, § 4, Sept. 24, 1963, 77 Stat. 207.

these were a proximate cause of the collisions and entanglements.

As a result of the collision and entanglement with the F/V CHRISSY & KATHY the geophysical party operated by G.S.I. under contract with Pan American Petroleum Corporation was unable to resume operations for three days. Mr. Louis H. Sole, the cable repair manager in Berwick, Louisiana testified that G.S.I. at Aransas Pass was sent a completely new cable by freight line truck as soon as he got word, which was the day of the accident or the day after. In considering transportation time, the time necessary to put the cable into operation and the weather conditions that would have prevented G.S.I. from operating in any event, the F/V CHRISSY & KATHY caused a three day loss to libellant.

During November, 1965, the geophysical party had averaged 39.5 miles per day and its earnings were $236.88 per mile. The money saved by G.S.I. as a result of its inability to operate was $250.00 per day. In the three (3) day period the total number of miles lost was 118.5 and the consequent earnings lost were $28,070.28, less $750.00 (the amount saved by G.S.I. as a result of its inability to operate) or a total amount of $27,320.28.

With the additional sum of $5,927.09 for the costs of repairs to the cable, G.S.I. is entitled to recover from the F/V CHRISSY & KATHY, her engines, tackle, furniture, apparel, etc., the total of $33,247.37, with interest on said sum at the rate of 6% per annum from the date of judgment until paid.

Costs of this action are taxed against respondents F/V CHRISSY & KATHY.

This Memorandum and Order shall constitute the findings of fact and conclusions of law of this Court. Counsel for libellant will prepare and submit an appropriate form of judgment for entry after giving opposing counsel an opportunity to approve the judgment as to form. The Clerk will send copies hereof to counsel.